## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

MIDDLE EAST BROADCASTING
NETWORKS, INC.
7600 Boston Boulevard
Springfield, VA 22153,

                *Plaintiff*,

v.

THE UNITED STATES OF AMERICA;

UNITED STATES AGENCY FOR GLOBAL
MEDIA,
Wilbur J. Cohen Federal Building
330 Independence Avenue, SW
Washington, D.C. 20237;

KARI LAKE, in her official capacity as
Senior Advisor to the Acting CEO of the
United States Agency for Global Media,
Wilbur J. Cohen Federal Building
330 Independence Avenue, SW
Washington, D.C. 20237;

VICTOR MORALES, in his official capacity
as Acting Chief Executive Officer of the
United States Agency for Global Media,
Wilbur J. Cohen Federal Building
330 Independence Avenue, SW
Washington, D.C. 20237;

OFFICE OF MANAGEMENT AND
BUDGET,
725 17th Street, NW
Washington, D.C. 20503;

RUSSELL VOUGHT, in his official capacity
as Director of United States Office of
Management and Budget
725 17th Street, NW
Washington, D.C. 20503;

Case No. _____

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND PETITION
FOR WRIT OF MANDAMUS

1

UNITED STATES DEPARTMENT OF
TREASURY,
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220;

and

SCOTT BESSENT, in his official capacity as
United States Secretary of the Treasury,
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220,

                    *Defendants.*

## **COMPLAINT**

1.      This case challenges a federal agency's unilateral refusal to follow laws duly

enacted by Congress.  Congress appropriated funds directly to the Middle East Broadcasting

Networks, Inc. (MBN) so that it can provide news and information to countries in the Middle

East and North Africa having that have limited or no access to free press and media.  To ensure

that MBN receives the money set aside for it, Congress charged the United States Agency for

Global Media (USAGM) with "allocat[ing] funds appropriated" to MBN and authorized

USAGM to do so via "grants and cooperative agreements."  22 U.S.C. § 6204(a)(6), (5).

USAGM has nevertheless refused to grant or disburse MBN's appropriated funds on the basis

that the grant "no longer effectuates agency priorities."  But Congress did not give USAGM

discretion to unilaterally withhold MBN's congressionally appropriated funds.  Urgent relief is

needed to compel USAGM to follow the law and release MBN's appropriated funds.

2.      In the wake of the terrorist attacks of September 11, 2001, the 9/11 Commission

Report called for the United States to fund independent television and radio journalism in the

Arab world.  In 2003, Congress recognized that need by setting aside funding for the Middle East

Broadcasting Networks.  Since then, MBN has provided accurate, uncensored news and forums for open debate in countries across the Middle East and North Africa, including those where freedom of expression is limited and local news media are either controlled by the state or otherwise limited in their independence.

3.      For almost two decades, without interruption and with bipartisan support, MBN has dutifully fulfilled its mission, reaching millions of people in countries across the Middle East, many of whom are otherwise unable to access objective, independent journalism.  MBN, for instance, has countered the violent extremism and anti-American propaganda of messaging from groups like the Islamic State of Iraq and Syria (ISIS) and the Islamic State of Iraq and Levant (ISIL).

4.      Since MBN's inception, Congress has regularly appropriated funding for the organization.  The executive agency charged with distributing these funds, USAGM, has—until now—always complied with its statutory mandate to "allocate funds appropriated" to MBN.  22 U.S.C. § 6204(a)(6).  MBN depends entirely on these congressionally appropriated funds to sustain its journalistic work.

5.      Despite this statutory mandate and Congress's express appropriation of funds to MBN, USAGM has impounded MBN's congressionally appropriated funds.  On March 15, 2025, USAGM issued a letter purporting to terminate MBN's grant, confirming that USAGM has made a final decision to impound MBN's appropriated funds.  USAGM terminated MBN's grant on the stated basis that funding MBN "no longer effectuates agency priorities," and in response to a March 14 Executive Order directing USAGM to eliminate "all non-statutorily required activities and functions."  But that is no justification:  Funding MBN is a statutorily required activity and function.  On March 31, 2025, confronting an increasingly dire financial

situation, MBN submitted a drawdown request for its April funding.  Consistent with the March

15 letter's notice of grant termination, USAGM has ignored that request.

6.     USAGM's actions defy congressional commands and the U.S. Constitution.  As a

result of the termination of its grant, on March 23, 2025, MBN furloughed nearly all its U.S.-

based staff, reduced its television newscasts and digital content, and effectively shuttered its

headquarters.  Its foreign-based journalists—who often risk their lives to provide reliable and

unbiased news in countries that are hostile to a free press—may soon lose MBN's advocacy and

protection and, as a result, will face an even greater risk of physical harm.  Meanwhile, MBN's

reputation—as a reliable news source, a protector of journalists who put themselves in harm's

way, and as a partner to local media outlets—may never recover.  These harms threaten the very

existence of MBN and its ability to fulfill Congress's goal of providing reliable, uncensored

news in countries where press freedom is weakest.

### JURISDICTION AND VENUE

7.     The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, and 1361.

8.     Venue is proper in this district because Defendants reside in, and a substantial part

of the events or omissions giving rise to the claims occurred in, this judicial district.  28 U.S.C. §

1391(e).

### PARTIES

9.     Plaintiff MBN is a private, nonprofit 501(c)(3) organization incorporated in

Washington, D.C. and headquartered in Springfield, Virginia.  MBN's mission is to deliver

uncensored, domestic news and information to places in the Middle East and North Africa with

poor media environments and few, if any, free speech protections.

10.     Defendant the United States of America is sued in its governmental capacity as a proper party defendant for actions seeking relief under the Administrative Procedure Act (APA), 5 U.S.C. § 702.

11.     Defendant United States Agency for Global Media is a federal agency that makes and administers grants supporting the United States' international broadcasting efforts worldwide.

12.     Defendant Victor Morales is Acting Chief Executive Officer of USAGM.  He is sued in his official capacity.  The CEO of USAGM supervises all activities relating to broadcasting, including by making and supervising grants for broadcasting and related activities. *See generally* 22 U.S.C. § 6204(a).

13.     Defendant Kari Lake is Senior Advisor to the Acting Chief Executive Officer of the USAGM.  She is sued in her official capacity.

14.     Defendant the Office of Management and Budget (OMB) is an administrative agency within the Office of the President of the United States.  Defendant OMB apportions congressionally appropriated funding to USAGM to be disbursed to MBN.

15.     Defendant Russell Vought is the Director of OMB.  He is sued in his official capacity.

16.     Defendant United States Department of Treasury is a federal agency headquartered in Washington, D.C., with responsibility for managing federal finances.

17.     Defendant Scott Bessent is the United States Secretary of the Treasury.  He is sued in his official capacity.

## FACTS

### A. The Middle East Broadcasting Networks

18.    MBN is a private, nonprofit, multimedia news organization that provides objective, accurate, and relevant news and information through television and digital platforms to 22 Arabic-speaking nations across the Middle East and North Africa.  Established in 2003, it operates through several platforms: Alhurra, a satellite television channel, and multiple digital sites, including Alhurra.com and branded social media accounts.  The MBN network reaches approximately 34 million adults in the region on a weekly basis.

19.    Since its founding, MBN has been funded by appropriations from the U.S. Congress.

20.    In the wake of the terrorist attacks of September 11, 2001, the 9/11 Commission Report cited "promising initiatives" of U.S. international broadcasting efforts in the Middle East and called for increased funding for those efforts.[1]

21.    In that vein, Congress enacted the Emergency Wartime Supplemental Appropriations Act, 2003 (P.L. 108-11), which included initial funding "for activities related to the Middle East Television Network broadcasting to the Middle East and radio broadcasting to Iraq."  Pub. L. No. 108-11, 117 Stat. 559, 562 (2003).  From its inception, MBN had the "enthusiastic support of President Bush and key leaders of the Administration and Congress"[2]

---

[1] The 9/11 Commission Report at 377 (2004) ("Recognizing that Arab and Muslim audiences rely on satellite television and radio, the government has begun some promising initiatives in television and radio broadcasting to the Arab world, Iran, and Afghanistan.  These efforts are beginning to reach large audiences.  The Broadcasting Board of Governors has asked for much larger resources.  *It should get them*." (emphasis added)), *available at* https://9-11commission.gov/report/.

[2] Statement of Hon. Kenneth Y. Tomlinson, Chairman of the Broadcasting Board of Governors, Hearing of the Subcommittee on International Operations and Terrorism, Committee on Foreign Relations, "The

and was considered a "key tool in the war on terrorist attempts to spread hatred and intolerance."[3]

22.     MBN is funded by specific, line-item appropriations from Congress, but receives its money through grants from the United States Agency for Global Media (USAGM).  The United States International Broadcasting Act of 1994 authorizes USAGM to "allocate funds appropriated for international broadcasting activities among the various elements of the Agency and grantees," including through "grants and cooperative agreements."  *See* 22 U.S.C. § 6204(a)(6), (5).  USAGM is charged with funding similarly situated nonprofit organizations, including Radio Free Europe/Radio Free Liberty, Radio Free Asia, and the Open Technology Fund.[4]

23.     MBN was officially incorporated in Washington, D.C. in April 2003, and Alhurra TV went live the next year.  Today, MBN provides independent, uncensored, and accurate news to audiences primarily in the Middle East and North Africa region who lack access to a free press or live in media environments vulnerable to disinformation.  MBN, for instance, has countered the violent extremism and anti-American propaganda of messaging from groups like the Islamic State of Iraq and Syria (ISIS) and the Islamic State of Iraq and Levant (ISIL).

24.     At the heart of MBN's ability to provide top-quality journalism are its statutory protections for journalistic integrity.  Congress mandated that agency programming meet the "highest professional standards of broadcast journalism," 22 U.S.C. § 6202(a)(5), and that it be

---

Broadcasting Board of Governors: Finding the Right Media for the Message in the Middle East" at 6 (April 29, 2004).

[3] Statement of Sen. John E. Sununu, Chairman of the Subcommittee on International Operations and Terrorism, *id.* at 1.

[4] *See* Organizational Chart, U.S. AGENCY FOR GLOBAL MEDIA (Nov. 7, 2024), https://www.usagm.gov/who-we-are/organizationalchart/, *archived at* https://perma.cc/4K9J-4H6P.

"consistently reliable and authoritative, accurate, objective, and comprehensive," *id.*
§ 6202(b)(1).  To help achieve that vision, Congress adopted a statutory firewall to insulate
MBN's journalists and content from any and all political influence, including by or through
USAGM.  For instance, the statute directs the USAGM CEO and Secretary of State to "respect
the professional independence and integrity" of MBN, and it bars the USAGM CEO and any
other full-time federal employee from serving on MBN's board.  22 U.S.C. § 6204(b), (c)(2).

25.    MBN is able to provide quality independent news in the Middle East region
because of decades of sustained efforts to recruit local journalists and staff with the relevant
language skills and cultural knowledge.  MBN's reporters, editors, and producers are almost
uniformly from the countries that MBN serves.

26.    MBN employs more than 500 people, including nearly 400 in the United States
(where it is headquartered) and nearly 100 in Dubai (the site of its regional production center).

**B.  The Middle East Broadcasting Networks Is Funded By Direct Congressional Appropriation**

27.    MBN is a private entity that is funded by specific, line-item appropriations from
Congress, but it is not itself a federal government entity.  *See* 22 U.S.C. §§ 6204(a)(5), 6209(c).

28.    Unlike other nongovernmental organizations, which receive funds at the
discretion of federal agencies, MBN is funded through annual appropriations that Congress
provides specifically for MBN.  All of MBN's funding comes from its federal appropriation; it
has no other source of money.

29.    For Fiscal Year 2024, Congress appropriated funds for MBN in the Further
Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F, 138 Stat. 460 (2024) (2024
Appropriations Act), providing that the "funds appropriated under this heading *shall be allocated*

in accordance with the table included under this heading in the explanatory statement described in section 4." *Id.* at 735 (emphasis added). The table referenced in the text of the statute allocated $100 million to MBN for the 2024 fiscal year.[5] Explanatory Statement Submitted by Ms. Granger, Chair of the House Committee on Appropriations, Regarding H.R. 2882, Further Consolidated Appropriations Act, 2024, 170 Cong. Rec. H1501, H2089 (Mar. 22, 2024).

30.    Congress has extended MBN's funding through September 2025. For Fiscal Year 2025, Congress adopted three continuing resolutions that fund USAGM at the same levels and "under the authority and conditions" that Congress funded USAGM in Fiscal Year 2024.[6] By appropriating funds under the same conditions specified in the 2024 Appropriations Act, the Fiscal Year 2025 continuing resolutions together mandate that $100 million once again "shall be allocated" to MBN.

31.    USAGM lacks discretion to withhold MBN's appropriated funds wholesale. Congress provided limited circumstances under which USAGM may reprogram funds among different programs. Critically, USAGM may not reprogram funds if doing so would reduce funding for a program, such as MBN, by more than 5 percent. 2024 Appropriations Act, 138 Stat. at 735; *see also* 170 Cong. Rec. at H2087. And USAGM may not even implement that modest (less than 5 percent) reprogramming of funds unless it provides the House and Senate

---

[5] Incorporation by reference is a well-accepted legislative tool in the appropriations context, and the Government Accountability Office has recognized that incorporation by reference renders spending language legally binding. *See, e.g.*, B-316010, Consolidated Appropriations Act, 2008 – Incorporation by Reference (Feb. 25, 2008), https://www.gao.gov/assets/b-316010.pdf.

[6] *See* Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 118-83, div. A, § 101(11), 138 Stat. 1524, 1524–25 (2024) (First Continuing Resolution) (appropriating funds as provided in the 2024 appropriations law and making them available through December 20, 2024); American Relief Act, 2025, Pub. L. No. 118-158, div. A. § 101(1), 138 Stat. 1722, 1723 (2024) ("Second Continuing Resolution") (extending funding through March 14, 2025); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, div. A, § 1101(11), 139 Stat. 9 (2025) ("Third Continuing Resolution") (extending funding through September 30, 2025).

Appropriations Committees with 15 days advance notice.  2024 Appropriations Act, 138 Stat. at 735; *see also* 170 Cong. Rec. at H2087; 22 U.S.C. § 6204(a)(6).

32.    Once the congressional appropriation is enacted and signed into law, OMB is responsible for apportioning MBN's appropriated funds to USAGM so that they may be disbursed to MBN.  *See* 31 U.S.C. § 1513(b).[7]

33.    USAGM is required to transfer appropriated funding to MBN.  In the appropriations legislation, Congress directed that appropriated funds "shall be allocated" to MBN.  In the U.S. International Broadcasting Act of 1994, Congress required USAGM to "allocate funds appropriated for international broadcasting activities among the various elements of the Agency and grantees" and empowered USAGM to "make and supervise grants and cooperative agreements" to that end.  22 U.S.C. § 6204(a)(6), (5).  By conferring that authority on USAGM and USAGM alone, the Act mandates that USAGM award MBN its appropriated funds.

34.    Pursuant to that statutory mandate, each year USAGM has entered into grant agreements with MBN, awarding funds on an ongoing basis as they are appropriated, whether by annual appropriations acts or continuing resolutions.

35.    MBN typically submits letter drawdown requests via email each month to request payment of the grant funds.  In the ordinary course, USAGM receives MBN's drawdown requests and promptly causes MBN's appropriated funds to be transferred to MBN's bank account by the Department of Treasury, a process that usually takes a few days.

---

[7] The apportionment obligation is assigned by statute to the President, who has delegated the authority to the Director of OMB. *See Notice; Delegation of Apportionment Authority*, 90 Fed. Reg. 9737 (Feb. 18, 2025), https://www.federalregister.gov/documents/2025/02/18/2025-02720/notice-delegation-of-apportionment-authority.

### C. USAGM Has Unlawfully Impounded MBN's Congressionally Appropriated Funds

36.    For the first part of Fiscal Year 2025, USAGM provided grant funds to MBN in the usual course.

37.    In late February, MBN received, through a grant from USAGM, its congressionally appropriated funds through March 31, 2025, as expected.

38.    But on March 14, 2025, Executive Order "Continuing the Reduction of the Federal Bureaucracy" was issued.[8]  The order provided that the "non-statutory components and functions of" specified agencies, including USAGM, "shall be eliminated to the maximum extent consistent with applicable law."[9]  The Executive Order directed OMB to review the budget request from USAGM and "to the extent consistent with applicable law . . . reject funding requests . . . to the extent they are inconsistent with this order."[10]  The Executive Order did not purport to define USAGM's function of allocating congressionally appropriated funds to MBN as a "non-statutory function."  Nor could it have—Congress left the Executive no discretion to withhold MBN's appropriated funds.

39.    On the morning of Saturday, March 15, 2025, MBN received a one-page letter from Defendant Lake purporting to terminate MBN's funding effective that same day.  In terminating MBN's grant, MBN confirmed that it had made a final decision to impound MBN's congressionally appropriated funds through the end of Fiscal Year 2025.[11]

---

[8] Exec. Order No. 14, 238, 90 Fed. Reg. 13043 (Mar. 14, 2025).

[9] *Id.* § 2(a).

[10] *Id.* § 2(c).

[11] Defendant Lake's March 15 letter advised that MBN could object to or challenge the termination decision by submitting an appeal addressed directly to Defendant Lake within 30 days.  MBN timely submitted an appeal letter on March 27, 2025.  The letter explained why USAGM's termination was unlawful and requested that USAGM inform MBN by March 31, 2025 whether USAGM would rescind MBN's termination notice, as it had done for Radio Free Europe/Radio Liberty.  Given MBN's worsening

40.     USAGM's termination letter advised that it was terminating MBN's funding because MBN "no longer effectuates agency priorities," citing the March 14 Executive Order. The letter further instructed MBN to discharge its "closeout obligations" and directed it to "promptly refund any unobligated funds" that had been received but "are not authorized to be retained"—or else face enforcement action.

41.     The letter provides no information supporting USAGM's claim that MBN no longer effectuates agency priorities. And the fact that each of MBN's sister entities received identical termination letters, simultaneously, strongly suggests that no finding regarding MBN was made.

42.     But even if the letter had provided additional detail, there is simply no statutory authority for USAGM to withhold MBN's congressionally appropriated funds based on "agency priorities." It is Congress's priorities—and not USAGM's—that govern here. Indeed, Congress itself insulated MBN from changing agency priorities, providing that the USAGM CEO and the Secretary of State must "respect the professional independence and integrity" of MBN. 22 U.S.C. § 6204(b).

43.     In MBN's more than two-decade history, it is not aware of any instance in which USAGM or its predecessor agency has outright refused to grant or disburse funds that Congress appropriated for MBN. The denial of access to funds mandated by law is unprecedented and will, if not remedied immediately, inflict irreparable harm on MBN and require MBN to cease its operations. That is contrary to Congress's expressed intent, as indicated by the statutory

---

financial situation, the letter further indicated that, absent USAGM intervention, MBN would be forced take appropriate legal action to restore its funding. USAGM did not respond to MBN's letter by March 31, 2025, and MBN proceeded to file the instant action.

provisions governing MBN's operation, as well as Congress's consistent and direct appropriation of funds to MBN, most recently in the Third Continuing Resolution enacted on March 15, 2025.

**D.  Harm to the Middle East Broadcasting Networks**

44.    As a result of USAGM's termination letter, MBN is currently facing and will continue to face irreparable harms to its operations and to the security of its journalists.

45.    Because of the grant termination, MBN already has been forced to significantly scale back its operations.  When MBN learned in mid-March that its grant had been terminated by USAGM, MBN made the difficult, but necessary, decision to conserve funds by furloughing 95% of its domestic staff.

46.    MBN took this drastic measure to enable the organization to continue providing employees with healthcare and to keep the lights on for as long as possible.

47.    Without its congressionally appropriated funds, MBN will be forced to further reduce or stop the vast majority of its journalistic work and will continue to be at risk of ceasing to exist as an organization.

48.    Failing to provide MBN with its congressionally mandated funding will effectively end MBN's operations by requiring it to halt essentially all broadcasting and news operations.  Its ability to pursue its congressionally mandated mission will be eliminated.  MBN reaches approximately 34 million adults every week.  Stopping news coverage in countries where there are few, if any, alternative news sources save state-controlled or state-influenced media will mean that millions of people will lose access to their only source of free and independent media coverage of critical events.  This will irrevocably harm MBN's reputation and credibility among those who rely on MBN's platforms for news.

49.     MBN's loss of funding and the termination of its grant will also impose unrecoverable financial losses on the organization.  For example, MBN is responsible for multiple leases and obligations on which it will be forced to default without Congress's appropriated funds.

50.     MBN relies on journalists from and in other countries to do some of its most critical reporting.  Many of these journalists have faced threats to their personal security arising from their reporting.  MBN journalists and their family members have been targeted by the groups and governments that they cover; they have been threatened and subjected to physical violence.  MBN helps protect its journalists from these dangers by advising on physical safety, providing safety equipment, conducting risk assessments prior to news assignments, conducting safety trainings, and assisting staff with relocation.  If MBN's congressionally appropriated funding is not restored, it will not be able to provide such assistance to its journalists, thereby endangering those journalists and their families.

51.     MBN's workforce relies on journalists who live and work in the United States on non-immigrant, employment-based visas.  Those visas require them to be working and paid for their work to remain here.  If MBN does not receive its congressionally appropriated funding, it will have to terminate these staff members, at which point they will no longer satisfy the terms of their visas and may be forced to return to home countries hostile to MBN's mission.  In addition, in Dubai, where MBN operates its regional production center, many employees' residency similarly is based on their work for MBN.  MBN's loss of funding will mean that those journalists could lose employment status, putting them at risk of losing their work visas and leading to their and their families' deportation.  Because some of the employees' home countries

are hostile to the United States and to a free and open press, they could face significant consequences upon their return.

52.     Irreparable harms also flow from USAGM's position in the grant termination letter that MBN must review and discharge its "closeout responsibilities as set forth in 2 C.F.R. § 200.344-46." MBN estimates that those closeout responsibilities could cost up to $50,000,000, and MBN does not have sufficient funds to cover those costs. Those costs include contractual termination fees on leases; payments of outstanding invoices and cancellation fees to vendors; mandatory end of service and related payments to its overseas staff; financial obligations (including severance) to its staff in the United States; and relocation expenses for the more than 100 employees whose visas are employment-based and who would be forced to leave the United States and the United Arab Emirates if their jobs were eliminated. Irreparable harm also flows from other closeout obligations that a grant termination could trigger, including the obligation to make reasonable efforts to discontinue costs—an obligation that could prevent MBN from resuming ordinary operations even if it had funds with which to operate.

53.     Absent judicial relief to ensure the restoration of access to congressionally appropriated funding, MBN's reputation and ability to perform its mission will be harmed irrevocably. Many MBN journalists operate in risky environments. MBN has spent two decades building trust and credibility with its journalists and with sources. At present, MBN does not have enough cash on hand to survive the month of April. If forced to close its doors, even for a short period of time, MBN's credibility will be damaged with journalists it may later hope to employ or re-employ. Moreover, if MBN is not able to protect its current journalists, it will be very difficult for MBN to persuade journalists to join or rejoin MBN in the future. The lack of

access to congressionally appropriated funding therefore severely undermines MBN's

journalistic mission and contribution to freedom of the press around the world.

## CLAIMS FOR RELIEF

### COUNT ONE
**APA, 5 U.S.C. § 706(2)(A)–(C)**
**(Against All Defendants)**

54.    Plaintiff restates and realleges all paragraphs above as if fully set forth here.

55.    The Administrative Procedure Act (APA) provides that a court "shall" "hold

unlawful and set aside agency action" found to be "arbitrary, capricious, an abuse of discretion,

or otherwise not in accordance with law[,]" "contrary to constitutional right, power, privilege, or

immunity[,]" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory

right[.]"  5 U.S.C.§ 706(2)(A)–(C).

56.    Defendants' impoundment of MBN's congressionally appropriated funding and

termination of MBN's grant agreement is final agency action reviewable under 5 U.S.C. § 704.

57.    Defendants' actions are "final" because Defendant Lake's March 15, 2025, Notice

of Grant Termination Letter, "mark[s] the consummation of the agency's decisionmaking

process" and is an action by which "rights or obligations have been determined, or from which

legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 156, 177–78 (1997) (citation and

internal quotation marks omitted).

58.    Defendants' actions are contrary to law and in excess of statutory authority

because the International Broadcasting Act and the relevant appropriations laws create a

mandatory, non-discretionary duty for Defendants to make available to MBN its congressionally

appropriated funds.  22 U.S.C. § 6204(a)(5); Third Continuing Resolution.  Defendants have not

fulfilled that duty.

59.     Defendants' actions are also contrary to law because they breach the statutory firewall that Congress enacted to protect MBN journalists from political influence, including through USAGM.  That firewall aims to ensure that MBN programming will meet the "highest professional standards of broadcast journalism," 22 U.S.C. § 6202(a)(5), and be "consistently reliable and authoritative, accurate, objective, and comprehensive," *id.* § 6202(b)(1).  Pursuant to that firewall, the USAGM CEO must "respect the professional independence and integrity" of MBN.  *Id.* § 6204(b).  As officers of USAGM and its associated entities, Defendants Lake and Morales are bound by the statutory firewall.  They have violated the firewall by interfering with and indeed preventing MBN's newsgathering and news dissemination.

60.     Defendants' actions are also contrary to the United States Constitution because Defendants are unlawfully withholding funds appropriated by Congress for MBN through the constitutionally prescribed legislative process, in violation of the Separation of Powers, as well as the Take Care Clause, the Appropriations Clause, the Spending Clause, and the Presentment Clause of the United States Constitution.

61.     Defendants' actions are arbitrary and capricious because, among other things, Defendants' impoundment of MBN's funds lacks any lawful basis; because Defendants have not articulated an adequate, reasoned, or lawful basis for the withholding of MBN's congressionally appropriated funds; because Defendants' actions threaten MBN's continued existence, in direct contravention of Congress's expressed intention; and because Defendants have entirely failed to consider the substantial reliance interests in MBN's continued funding and operation, including without limitation: MBN's ability to fulfill its mission; MBN's employees, some of whom will be at risk of physical harm, or of losing their visas and subsequently being deported, if MBN

does not receive its congressionally appropriated funding; and the leases and other obligations on which MBN will be forced to default without its funding.

## COUNT TWO

### APA, 5 U.S.C. § 706(1)

### (Against All Defendants)

62.    Plaintiff restates and realleges all paragraphs above as if fully set forth here.

63.    The APA provides that a reviewing court "shall" "compel agency action unlawfully withheld or unreasonably delayed[.]" 5 U.S.C. § 706(1).

64.    In the Third Continuing Resolution, Congress appropriated funds for MBN.

65.    USAGM has a non-discretionary duty to make grants available to MBN from congressionally appropriated funds. 22 U.S.C. § 6204(a)(5). The Department of the Treasury has a non-discretionary duty to disburse the funds in its charge upon receipt of a properly executed voucher. 31 U.S.C. § 3325.

66.    Defendants have not complied with their non-discretionary duties to grant appropriated funds to MBN and disburse those appropriated funds to MBN.

67.    Defendants' actions are also contrary to the United States Constitution because they are unlawfully withholding funds appropriated by Congress for MBN through the constitutionally prescribed legislative process, in violation of the Separation of Powers, as well as the Take Care Clause, the Appropriations Clause, the Spending Clause, and the Presentment Clause of the United States Constitution.

68.    The Court should thus compel Defendants to grant and disburse to MBN the funds appropriated for that purpose and to which MBN is entitled for Fiscal Year 2025.

## <u>COUNT THREE</u>

**Mandamus Act, 28 U.S.C. § 1361; All Writs Act, 28 U.S.C. § 1651**

**(Against Defendants USAGM, Kari Lake, Victor Morales, OMB, Russell Vought,**

**Department of Treasury, and Scott Bessent)**

69.     Plaintiff restates and realleges all paragraphs above as if fully set forth here.

70.     The Mandamus Act, 28 U.S.C. § 1361, vests this Court with original jurisdiction over "any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

71.     The All Writs Act, 28 U.S.C. § 1651, authorizes this Court to issue all writs "necessary or appropriate" in aid of its jurisdiction.

72.     In the Third Continuing Resolution, Congress appropriated funds for MBN.

73.     USAGM has a non-discretionary duty to make annual grants available to MBN from congressionally appropriated funds.  22 U.S.C. § 6204(a)(5).  The Department of the Treasury has a non-discretionary duty to disburse the funds in its charge upon receipt of a properly executed voucher.  31 U.S.C. § 3325.

74.     Defendants have not complied with their non-discretionary duties to grant appropriated funds to MBN and disburse those appropriated funds to MBN.

75.     USAGM indicated that MBN could challenge the termination letter by filing an appeal with the agency.  MBN did so and has therefore pursued the only alternative remedy that the agency has indicated may be available.

76.     It is necessary and appropriate for this Court to issue a writ of mandamus pursuant to 28 U.S.C. §§ 1361 and 1651 and under this Court's equitable authority to compel Defendants to grant, disburse, and otherwise make accessible MBN's appropriated funds.

## COUNT FOUR

### Presentment Clause, U.S. Const. art. I, § 7, cl. 2

### (Against Defendants Kari Lake, Victor Morales, Russell Vought, and Scott Bessent)

77.    Plaintiff restates and realleges all paragraphs above as if fully set forth here.

78.    This Court has inherent equitable power to enjoin executive conduct that violates the Constitution.  *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

79.    The Presentment Clause provides, in relevant part: "Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States; If he approve he shall sign it, but if not he shall return it[.]" U.S. Const. art. I, § 7, cl. 2.  Under the Presentment Clause, the President lacks authority to modify or amend duly enacted Legislation—the President may only "approve all the parts of a Bill, or reject it in toto."  *Clinton v. City of New York*, 524 U.S. 417, 439–40 (1998) (citation omitted).  The President cannot delegate powers to other executive branch officials that violate the Constitution.

80.    The International Broadcasting Act and the congressional appropriations laws mandating that funds be allocated to MBN for Fiscal Year 2025 are duly enacted legislation that leave no room for executive discretion.

81.    Defendants' unlawful impoundment of MBN's congressionally appropriated funds therefore amounts to an attempt to amend, modify, or partially veto duly enacted legislation in violation of the Presentment Clause.

## COUNT FIVE

### Appropriations Clause, U.S. Const. art. I, § 9, cl. 7

### (Against Defendants Kari Lake, Victor Morales, Russell Vought, and Scott Bessent)

82.     Plaintiff restates and realleges all paragraphs above as if fully set forth here.

83.     This Court has inherent equitable power to enjoin executive conduct that violates the Constitution.  *See Free Enter. Fund*, 561 U.S. at 491 n.2.

84.     The Appropriations Clause of the Constitution provides: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law[.]" U.S. Const. art. I, § 9, cl. 7.  The Clause protects Congress's "exclusive power over the federal purse."  *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (quoting *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992)).  The Executive Branch does not have constitutional authority to override or disregard Congress's appropriations.  *In re Aiken Cnty.*, 725 F.3d 255, 260–61 (D.C. Cir. 2013).

85.     Defendants' unlawful impoundment of MBN's congressionally-appropriated funds infringes Congress's exclusive power over the federal purse.  That exclusive power is conferred and protected in part by the Appropriations Clause, and the Executive has no constitutional authority to countermand it.

## COUNT SIX

### Spending Clause, U.S. Const. art. I, § 8, cl. 1

### (Against Defendants Kari Lake, Victor Morales, Russell Vought, and Scott Bessent)

86.     Plaintiff restates and realleges all paragraphs above as if fully set forth here.

87.     This Court has inherent equitable power to enjoin executive conduct that violates the Constitution.  *See Free Enter. Fund*, 561 U.S. at 491.

88.     The Spending Clause of the Constitution provides: "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States."  U.S. Const. art. I, § 8, cl. 1.  The Spending Clause vests the power of the purse, including the power to attach conditions to the expenditure of federal funds, exclusively with Congress.

89.     Defendants' unlawful impoundment of MBN's congressionally-appropriated funds infringes Congress's exclusive power over the federal purse.  That exclusive power is conferred and protected in part by the Spending Clause, and the Executive has no constitutional authority to countermand it.

## COUNT SEVEN

### Take Care Clause, U.S. Const. art. II, § 3
### (Against Defendants Kari Lake, Victor Morales, Russell Vought, and Scott Bessent)

90.     Plaintiff restates and realleges all paragraphs above as if fully set forth here.

91.     This Court has inherent equitable power to enjoin executive conduct that violates the Constitution.  *See Free Enter. Fund*, 561 U.S. at 491 n.2.

92.     Under the Constitution, the executive power vested in the President and, by extension, all subordinate officers to whom he may delegate executive functions, includes the duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

93.     The Take Care Clause forbids the Executive Branch from refusing to faithfully execute the laws of the United States.

94.     Defendants' unlawful impoundment of MBN's congressionally appropriated funds violates the Take Care Clause.

## COUNT EIGHT

### Violation of the Separation of Powers

### (Against Defendants Kari Lake, Victor Morales, Russell Vought, and Scott Bessent)

95.    Plaintiff restates and realleges all paragraphs above as if fully set forth here.

96.    This Court has inherent equitable power to enjoin executive conduct that violates the Constitution.  *See Free Enter. Fund*, 561 U.S. at 491 n.2.

97.    Defendants' unlawful impoundment of MBN's congressionally appropriated funds exceeds the executive branch's constitutional authority and impermissibly usurps the legislature's power, in violation of the Separation of Powers.  *See* U.S. Const. art. II, § 3; U.S. Const. art. I, § 9, cl. 7; U.S. Const. art. I, § 8, cl. 1; U.S. Const. art. I, § 7, cl. 2.

## COUNT NINE

### Ultra Vires

### (Against All Defendants)

98.    Plaintiff restates and realleges all paragraphs above as if fully set forth here.

99.    This Court has inherent equitable power to enjoin executive ultra vires conduct. *See Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022).  Judicial "[r]eview for ultra vires acts rests on the longstanding principle that if an agency action is unauthorized by the statute under which [the agency] assumes to act, the agency has violate[d] the law and the courts generally have jurisdiction to grant relief."  *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 970 (D.C. Cir. 2022) (alterations in original) (citation and internal quotation marks omitted).

100.    An agency acts ultra vires when it "plainly acts in excess of its delegated powers." *Fresno Cmty. Hosp. & Med. Ctr. v. Cochran*, 987 F.3d 158, 162 (D.C. Cir. 2021).

101.    No statute, constitutional provision, or other source of law authorizes Defendants to impound MBN's congressionally appropriated funds.  To the contrary, the International Broadcasting Act and the relevant appropriations laws require that Defendants make available annual grants to MBN from congressionally appropriated funds.  22 U.S.C. § 6204(a)(5); Third Continuing Resolution.

102.    Defendants' unlawful withholding of the MBN's congressionally appropriated funds is ultra vires.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

a.  Issue a temporary restraining order and preliminary injunction barring Defendants from impounding MBN's congressionally appropriated funds and barring Defendants from enforcing or otherwise giving effect to the termination of MBN's grant, including through the enforcement of closeout obligations;

b.  Stay the termination of MBN's grant pursuant to 5 U.S.C. § 705;

c.  Declare unlawful and set aside Defendants' impoundment of MBN's congressionally appropriated funds;

d.  Declare that the termination of MBN's grant is unlawful and null and void and set that termination aside;

e.  Declare that Defendants are required by law to take all necessary steps to ensure that USAGM disburses to MBN all congressionally appropriated funds through September 30, 2025;

f.  Issue a permanent injunction barring Defendants from withholding MBN's

congressionally appropriated funds and requiring Defendants to disburse MBN's

congressionally appropriated funds;

g.  Award MBN reasonable attorneys' fees and costs; and

h.  Grant such other relief as the Court deems necessary, just, and proper.

April 1, 2025                                    Respectfully submitted,

/s/ Kristin Bateman                             /s/ Donald B. Verrilli, Jr.
Kristin Bateman*^                               Donald B. Verrilli, Jr. (D.C. Bar. No. 420434)
Jennifer Fountain Connolly (D.C. Bar No.        Ginger D. Anders (D.C. Bar. No. 494471)
1019148)*                                       Jeremy S. Kreisberg (D.C. Bar No. 1048346)
Robin F. Thurston (D.C. Bar No. 1531399)        Helen E. White (D.C. Bar. No. 1741368)*
Skye L. Perryman (D.C. Bar No. 984573)          Esthena L. Barlow (D.C. Bar No. 90000252)*
Democracy Forward Foundation                    MUNGER, TOLLES & OLSON LLP
P.O. Box 34553                                  601 Massachusetts Avenue, NW, Suite 500E
Washington, D.C. 20043                          Washington, D.C. 20001
(202) 448-9090                                  (202) 220-1100
kbateman@democracyforward.org                   Donald.Verilli@mto.com
jconnolly@democracyforward.org                  Ginger.Anders@mto.com
rthurston@democracyforward.org                  Jeremy.Kreisberg@mto.com
sperryman@democracyforward.org                  Helen.White@mto.com
                                                Esthena.Barlow@mto.com

                                                Hailyn J. Chen**
                                                Adeel Mohammadi**
                                                MUNGER, TOLLES & OLSON LLP
                                                350 S. Grand Avenue, Fiftieth Floor
                                                Los Angeles, California 90071
                                                (213) 683-9100
                                                Hailyn.Chen@mto.com
                                                Adeel.Mohammadi@mto.com

                                                Gabriel M. Bronshteyn**
                                                MUNGER, TOLLES & OLSON LLP
                                                560 Mission Street, Twenty-Seventh Floor
                                                San Francisco, California 94105
                                                (415) 512-4000
                                                Gabriel.Bronshteyn@mto.com

*Admission pending
**Pro hac vice application forthcoming
^Admitted only in California; practice
supervised by members of the D.C. Bar

*Attorneys for the Middle East Broadcasting
Networks, Inc.*